[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

--------------------------------------------

No. 05-10782
Non-Argument Calendar

--------------------------------------------

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 18, 2005
THOMAS K. KAHN
CLERK

D.C. Docket No. 02-01305-CV-HS-NE

TERRY CALLOWAY,

Plaintiff-Appellant,

versus

PPG INDUSTRIES, INC.,
a corporation,

Defendant-Appellee.

----------------------------------------------------------------

Appeal from the United States District Court
for the Northern District of Alabama

----------------------------------------------------------------

(November 18, 2005)

Before EDMONDSON, Chief Judge, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Terry Calloway appeals the district court's order granting summary

judgment in favor of PPG Industries, Inc. ("PPG"), in this diversity action alleging

that PPG was negligent and acted wantonly by failing to provide a safe place to

work, by failing to inform Calloway of dangers in the workplace, and by failing to supervise and provide protective equipment. No reversible error has been shown; we affirm.

Calloway sought damages for injuries he sustained after falling out of the rafters at PPG's Huntsville, Alabama, plant while installing a chilled water line through the roof of the plant. At the time of the accident, Calloway was employed by Delta Industrial Services ("Delta"), who contracted with PPG to complete various jobs inside the plant. Calloway and another Delta employee, Ben Miller, were to install the line in a mid-ceiling area above a "clean room" with a dropped ceiling. Miller, who supervised the project, sat on air conditioning duct work in the mid-ceiling area to drill a hole in the roof. After drilling, Miller went onto the roof so that Calloway could feed the pipe to Miller through the drilled hole. Calloway crawled across some duct work about 15 feet above the floor to get near the dropped ceiling. No solid floor existed in this area, only metal beams; so Miller had positioned a 2" by 6" by 10' board over the beams for Calloway to stand on. Calloway stated that the area "wasn't pitch black dark but it was dark"; he could not see the board and had to locate it by touch. He then slid down the duct work about three feet onto the board and stood up. Calloway turned to reach

2

some pipe grease; but the board shifted and he fell through the dropped ceiling to the floor.  Neither Miller nor Calloway was wearing fall protection gear.

We review a district court's grant of summary judgment de novo; we view the evidence in the light most favorable to the party opposing the motion.  Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005).  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

Calloway argues that PPG had a duty--under law, under its own policies and contracts, and by its conduct--to protect his safety by advising him on fall protection, but that PPG negligently let him climb untrained and unprotected into the rafters at its plant.  Calloway maintains that the evidence shows that PPG retained the right to control safety in its plant, including how Delta employees performed their jobs.  Calloway maintains that PPG cannot avoid liability by delegating a dangerous job to a small company like Delta and then by failing to train uneducated workers like Calloway of the risks of their jobs.

To prevail on his negligence and wantonness claims, Calloway must show, among other things, that PPG owed him a duty.  See Kendrick v. Alabama Power Co., 601 So.2d 912, 914 (Ala. 1992).  The general rule in Alabama is that "a premises owner [PPG] owes no duty of care to employees [including Calloway] of

3

an independent contractor [Delta] with respect to working conditions arising during the progress of the work on the contract." Weeks v. Alabama Elec. Coop., Inc., 419 So. 2d 1381, 1383 (Ala. 1982). This rule will not apply if PPG "retains or reserves the right to control the manner in which the independent contractor performs its work." Id. If the right of control is retained, "the relationship changes from one of premises owner and independent contractor to that of master and servant." Id. (quotation omitted). But a master-servant relationship is not created "when the owner merely retains the right to supervise or inspect work of an independent contractor as it progresses for the purpose of determining whether it is completed according to plans and specifications, and retains the right to stop work that is not properly done." Id.

Thus, as the district court noted, determining the degree of control that PPG exercised over the work of Delta employees is essential to deciding whether PPG had a duty to provide Calloway with a safe workplace. And to determine whether PPG controlled the work performed by Delta, Alabama courts examine the written contract and the conduct of the parties pursuant to the contract. See Pugh v. Butler Tel. Co., 512 So. 2d 1317, 1318-19 (Ala. 1987).

We agree with the district court that the contracts and applicable documents show that Delta, not PPG, controlled the way in which Delta performed its work.

The purchase order for the chilled water line project states that PPG was to pay Delta for all labor, supervision, materials, equipment, and tools to install the line.[1] And the rider to the purchase order provides that Delta's status was that of independent contractor. Further, the purchase order, the rider, and PPG's "Contractor Safety Implementation Guidelines" ("Guidelines") place the responsibility for the safety of contractor employees on the contractor, Delta.[2]

As evidence of PPG's control over the safety of contractor workers, Calloway points to provisions in the Guidelines stating (1) that the contractor's job supervisor was to meet with a PPG representative before the work to review the required safety documents, including fall protection, and (2) that contractor employees were to receive, before working, initial job site safety training by the

---

[1] The general conditions to the purchase order show that PPG retained a right to inspect PPG's materials and fabrication; but this fact does not create a master-servant relationship between PPG and Delta. See Weeks, 419 So. 2d at 1383.

[2] The general conditions of the purchase order show (1) that Delta warranted that it would comply with all applicable laws and rules, including the Occupational Safety and Health Act of 1970 ("OSHA"), and (2) that PPG's inspection of Delta's materials and fabrication did not relieve Delta of its warranties. The rider provides (1) that Delta's work and services would be in compliance with OSHA standards, (2) that Delta was to take all necessary precautions for the safety of its personnel, and (3) that Delta was to develop a health and safety program prior to commencing work, the compliance with which Delta was solely responsible. And the Guidelines state that the contractor is responsible for (1) communicating and enforcing all safety regulations to its employees, and (2) supplying and enforcing the use of personal protective equipment to its employees. The Guidelines also set forth that the contractor is to provide adequate fall protection when the hazard of a fall exists as defined by OSHA standards.

contractor and a PPG representative. Calloway also relies on a general written statement by a PPG vice president that PPG would maintain a safe environment.

We do not read these items as PPG giving instructions to Delta employees on how to perform their work. Instead, these items, along with the other documentary evidence, show that PPG had the right, not the duty, to ensure that Delta complied with Delta's duties under the purchase order and rider, including workplace safety. See Pate v. U.S. Steel Corp., 393 So. 2d 992, 996 (Ala. 1981) (no duty where owner had contractual right to enforce safety but took no affirmative act to exercise this right); see also Columbia Eng'g Int'l, Ltd. v. Espey, 429 So. 2d 955, 967 (Ala. 1983) (drafting of contracts containing safety provisions does not constitute an undertaking to enforce safety).[3]

_____

[3] Our conclusion is not changed by Calloway's citation to PPG's own fall protection policy. The policy required training in fall protection and the use of a full body harness when the potential free fall was six feet or more; but the policy also stated that contractors were to assure that their employees were trained in basic fall protection before assigning those employees to work in elevated unprotected locations. And testimony about this policy by Bill Bajoras, a PPG engineer who oversaw the chilled waterline project, does not change our conclusion. Bajoras first stated that the fall protection policy applied to PPG employees. Calloway's lawyer asked if the same policies and procedures applied to anyone else in the plant; Bajoras answered, "As far as I guess it could be specific as far as, you know, who else is in the plant." But after this statement, on which Calloway places much emphasis, Bajoras testified that PPG attempted to adhere to industry safe work practices "[a]gain, for PPG employees." Nor are we persuaded by Bajoras's testimony that, if PPG observed a safety violation by a contractor employee, PPG could approach the contractor to correct the employee's behavior and that PPG eventually had the right to stop work if the contractor employees refused to comply with safety guidelines. See Thomas v. Pepper S. Constr. Co., 585 So. 2d 882, 884 (Ala. 1991) (stating that defendant's contractual right to enforce safety if violation is observed does not alone constitute a voluntary assumption of the duty to inspect for safety) (citation omitted).

And we agree with the district court that PPG, through its conduct, did not retain the requisite degree of control over the chilled water line project to create a duty to provide Delta employees with a safe workplace. Upon entering the plant, independent contractor workers were required to sign in; but this fact proves only that PPG employees knew that Delta (and other contractor) workers were on site. Delta was responsible for providing the equipment, including safety equipment, for the chilled water line project. Miller, a Delta employee, supervised the project; Miller guided Calloway on how to conduct the job and told him to stand on the board from which he ultimately fell. Only Miller and Calloway were present in the mid-ceiling area when the accident occurred; they saw no PPG employees while working in this area.[4]

We do not assign much weight to the fact that Delta completed many projects for PPG over seventeen years. As the district court noted, that a premises owner hires an independent contractor for many jobs does not by itself change the status of the independent contractor. More relevant is Calloway's contention that PPG assumed control by giving him a safety handbook and showing him a safety

---

[4] The project was conducted in a mid-ceiling area not in general view of the workers on the ground. Ray Piscorz, an owner of Delta, testified that the area where Calloway and Miller were working could be viewed by part of the plant and that he believed Miller and Calloway could have been seen as they climbed to the mid-ceiling area. But Calloway produced no evidence that a PPG employee did see Miller and Calloway as they climbed to and worked in the mid-ceiling area.

7

video.  See, e.g., <u>Ramirez v. Alabama Power Co.</u>, 898 F. Supp. 1537, 1543 (M.D. Ala. 1995) (offering "safety tips" to contractor employees is one factor showing control), <u>aff'd</u>, 86 F.3d 1170 (11th Cir. 1996) (table).  But we cannot say--in the light of all the other evidence establishing a lack of control by PPG over the chilled water line project--that showing a video and issuing a handbook raise a disputed fact issue that PPG retained control over the chilled water line project.

Calloway also contends that PPG was liable for his safety because installing the chilled water line was inherently dangerous due to the height at which the job occurred.  See <u>Boroughs v. Joiner</u>, 337 So. 2d 340, 342 (Ala. 1976) (stating general Alabama rule that "one who employs a contractor to carry on an inherently or intrinsically dangerous activity cannot thereby insulate himself from liability").  Because we affirm the district court's conclusion that PPG retained no control over Delta's installation of the chilled water line, we doubt that we can impose liability on PPG under the inherently dangerous act doctrine.  See <u>Procter & Gamble Co. v. Staples</u>, 551 So. 2d 949, 953 (Ala. 1989) (where contractor's injured employee seeks to charge premises owner with duty to provide safe workplace, plaintiff must prove that the defendant "exercised control over the jobsite and control over the manner in which the work was to be done, <u>and</u> prove

either that the work was intrinsically dangerous or that the defendant had undertaken to provide safety on the jobsite") (emphasis added).

In any event, Calloway presented no evidence that installing a chilled water line from an elevated location is inherently dangerous. An inherently dangerous act is "work fraught with danger, no matter how skillfully or carefully it is performed." Stovall v. Universal Constr. Co., 893 So. 2d 1090, 1099 (Ala. 2004) (citation omitted). Alabama courts have refused to categorize similar acts as inherently dangerous. See, e.g., id. (painting the interior of a rocket from a ladder at night was not inherently dangerous and noting that inherently dangerous work involves acts such as removal of highly caustic paint remover, aerial spraying of pesticide, and use of dynamite).

And Calloway asserts that the danger of this job was not obvious to him: he merely was an untrained laborer who followed orders and trusted his supervisor. PPG owed Delta's employees, as invitees, a duty to warn of hidden dangers known to PPG but (1) unknown to Delta or (2) that Delta could not have observed through the exercise of reasonable care. See Gen. Motors Corp. v. Hill, 752 So. 2d 1186, 1187 (Ala. 1999). But as the district court said, despite Calloway's purported lack of education, "[a] person using reasonable care should appreciate the danger of standing on a narrow board he could not see" while 15 feet above

the ground in an unfamiliar area in near darkness. See, e.g., Owens v. Nat'l Sec. of Alabama, 454 So. 2d 1387, 1389 (Ala. 1984) (stating, where plaintiff fell over forklift in darkened maintenance room, that "[w]hen someone proceeds through an unfamiliar facility in the dark, he has no right to assume that his course is clear").

Calloway also argues that, based on his expert's testimony, we should impose liability on PPG under the "multiemployer" doctrine: where an employer who controls a worksite safety hazard may be liable under OSHA, 29 U.S.C. § 654(a), even if the threatened employees are employees of another employer. See Universal Const. Co. v. Occupational Safety & Health Review Comm'n, 182 F.3d 726, 728 (10th Cir. 1999). But Calloway cites no binding authority where this Court has applied this doctrine of liability to property owners who do not function as general contractors; and we see no reason to impose such liability on PPG under the facts of this case. See Southeast Contractors, Inc. v. Dunlop, 512 F.2d 675 (5th Cir. 1975); Horn v. C.L. Osborn Contracting Co., 591 F.2d 318, 321 (5th Cir. 1979) (reading OSHA in conformance with general rule that "contractor is not responsible for the acts of his subcontractors or their employees" and refusing to apply multiemployer doctrine to employee of independent contractor); see also Am. Petroleum Inst. v. OSHA, 581 F.2d 493, 508 (5th Cir. 1978) (noting that doctrine applies to multiemployer construction worksites).

AFFIRMED.