J-A10028-17

2017 PA Super 322

| CHRISTOPHER KOVACEVICH | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| REGIONAL PRODUCE COOPERATIVE CORPORATION | |
| Appellee | No. 1774 EDA 2016 |

Appeal from the Order Dated April 29, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 130703315

BEFORE: DUBOW, J., SOLANO, J., and FORD ELLIOTT, P.J.E.

OPINION BY SOLANO, J.                    **FILED OCTOBER 13, 2017**

Appellant Christopher Kovacevich appeals the order dated April 29, 2016, denying his motion to remove the non-suit entered in favor of Appellee Regional Produce Cooperative Corporation ("RPCC"). We affirm.

RPCC is the management company that oversees operation of the Philadelphia Wholesale Produce Market ("the Market"), a food terminal and distribution center in South Philadelphia. The Market is housed in a large rectangular building containing private areas that are leased by multiple tenants for wholesale and retail sales of their produce. Between the tenant areas of the building is a large central concourse that is a common area maintained by RPCC. Trial Ct. Op. at 2.

T.M. Kovacevich, Inc. ("TMK") is one of the tenants leasing space in the Market. Appellant was employed by TMK as a salesman. On February 18, 2013, as Appellant was standing in front of a pallet in a

refrigerated area of TMK's leased space, his co-worker, Ernest Scarlata, approached him from behind while driving a pallet jack[1] manufactured by Crown Equipment Corporation that had a tall load of fruit loaded onto the vehicle's fork. Rather than driving the pallet jack with the fork behind him, Scarlata drove it "forks first." The loaded fruit obstructed Scarlata's view, and Scarlata drove the pallet jack into Appellant's back, causing Appellant to incur serious injuries.

On July 25, 2013, Appellant filed a complaint against Crown, alleging products liability, and against RPCC, alleging negligence.[2] The negligence claim against RPCC was based on a premises liability theory; Appellant alleged that RPCC had control over the employees of its tenants in the Market and therefore was responsible for the negligence of Scarlata in operating the pallet jack. Paragraph 9 of the complaint stated:

> At all times relevant hereto, . . . [RPCC] owned, leased, possessed, inspected, managed, controlled, supervised, maintained and/or was responsible for overseeing the aforesaid wholesale warehouse, including but not limited to all aspects of the design including safety and compliance with [the Occupational Safety and Health Administration ("OSHA")], the International Building Code, Pennsylvania and Philadelphia Building Codes and other applicable workplace safety laws, including safe materials handling.

---

[1] A pallet jack is a motorized forklift with a "fork" at one end that is used to pick up pallets.

[2] Appellant also brought claims against Material Handling Supply, Inc. and the Philadelphia Regional Port Authority, but the claim against Material Handling was settled and the claim against the Authority was dismissed.

Appellant claimed that Scarlata failed to operate the pallet jack in a safe manner. He claimed further that RPCC was responsible for that failure because Scarlata did not receive training and certification to operate a pallet jack under OSHA Standard 1910.178, 29 C.F.R. § 1910.178, which applies to "maintenance, and use of fork trucks, tractors, platform lift trucks, motorized hand trucks, and other specialized industrial trucks powered by electric motors or internal combustion engines." *See id.* § 1910.178(a)(1). Subsection (l) of that Standard, titled "Operator training," states, in part:

(1) Safe operation.

(i) The employer shall ensure that each powered industrial truck operator is competent to operate a powered industrial truck safely, as demonstrated by the successful completion of the training and evaluation specified in this paragraph (l).[3]

(ii) Prior to permitting an employee to operate a powered industrial truck (except for training purposes), the employer shall ensure that each operator has successfully completed the training required by this paragraph (l) . . . .

. . . .

(6) Certification. The employer shall certify that each operator has been trained and evaluated as required by this paragraph

_____

[3] The Standard requires training in, among other things, operating instructions, warnings, and precautions for the type of truck that will be operated; truck controls and instrumentation; steering and maneuvering; visibility (including restrictions due to loading); fork and attachment adaptation, operation, and use limitations; vehicle capacity and stability; vehicle inspection and maintenance; operating limitations; surface conditions where the vehicle will be operated; composition and stability of loads to be carried; load stacking and unstacking; pedestrian traffic near vehicle operations; and operation in narrow aisles, in hazardous locations, and on ramps and sloped surfaces. 29 C.F.R. § 1910.178(l)(3). An operator's performance must be evaluated every three years. *Id.* § 1910.178(l)(4)(iii).

(l). The certification shall include the name of the operator, the date of the training, the date of the evaluation, and the identity of the person(s) performing the training or evaluation.

29 C.F.R. § 1910.178(l)(1), (6). Appellant contends that RPCC was a "controlling employer" at the Market and therefore had a duty to assure that its tenants' workers received the training and certification required by OSHA. He contends further that by negligently breaching this alleged duty, RPCC became liable to Appellant for his injuries.

Appellant's "controlling employer" theory stems from OSHA regulatory policy. OSHA publishes a Field Inspection Reference Manual that "provides current information and guidance to [OSHA's] national, regional, and area offices concerning OSHA's policy and procedures for implementing inspections, issuing citations and proposing penalties." ***See*** OSHA Field Inspection Ref. Manual at ABSTRACT-2, (2016), *available at https://www .osha.gov/OshDoc/Directive_pdf/CPL_02-00-160.pdf,* at 1-1. In 1999, OSHA suspended a portion of that Manual that set forth OSHA's policy for issuing citations at multi-employer worksites. ***See*** OSHA Compliance Directive 02-00-124 (Dec. 10, 1999) (formerly numbered 2-0-124), *available at https://www.osha.gov/pls/oshaweb/owadisp.show_document?p _table=DIRECTIVES&p_id=2024#CHANGES.*[4] Directive 02-00-124 stated

---

[4] The compliance directive is in the certified record. The OSHA Manual is referenced in the compliance directive but is not in the certified record; we take judicial notice of it. The cited Internet locations are as of the date of this opinion.

- 4 -

that in the future, "[o]n multi-employer worksites (in all industry sectors), more than one employer may be citable for a hazardous condition that violates an OSHA standard," and that one type of employer that could be cited for a violation at the site was a "controlling employer" that had obligations with respect to OSHA requirements. *See id.* § X.A. The Directive defined a "controlling employer" as one "who has general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them," and said that an employer could meet this definition as a result of its contractual rights with respect to a jobsite or "if, in actual practice, it exercises broad control over subcontractors at the site." *Id.* § X.E.1., 5. Appellant sought to prove that RPCC was such a controlling employer at the Market with respect to assuring its tenants' compliance with OSHA responsibilities.

Appellant's case against RPCC and Crown Equipment was tried before the Honorable Marlene Lachman and a jury on January 8-21, 2016. During trial, Appellant presented witnesses who sought to show that RPCC met the criteria to be a controlling employer. At the close of Appellant's case, the court entered a non-suit on the claim against RPCC. On Appellant's claim against Crown, the jury rendered a verdict of no liability.

Appellant filed a motion for post-trial relief, requesting that the trial court remove the non-suit. In support of his motion, Appellant filed a copy of a July 20, 2012 letter from James Maddux, the director of OSHA's "Directorate of Construction," to the president of Clapp Research Associates,

P.C., that answered a Clapp inquiry about OSHA's multi-employer worksite policy and made comments about the policy's scope; the letter had not previously been made a part of the record.

The trial court denied Appellant's post-trial motion on April 29, 2016, and entered judgment in favor of RPCC. In a Rule 1925(a) opinion, the trial court explained that it had ruled in favor of RPCC for three reasons: (1) most fundamentally, the OSHA "controlling employer" policy concerns only OSHA enforcement actions and does not give rise to a legal duty that can provide a basis for damages recovery under Pennsylvania law, Trial Ct. Op. at 7-9; (2) even if the policy did provide some basis for creating a duty, it did not control in this case because it has been applied only in the construction context, *id.* at 4-7; and (3) even if the policy applied here, there was insufficient evidence to enable a jury to find that RPCC was a controlling employer under it, *id.* at 9-20.

On May 27, 2016, Appellant filed a notice of his appeal to this Court, in which he presents three issues for our review:

> 1. Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law in granting [RPCC's] Motion for Non-Suit because [RPCC] was a "controlling employer" at the multi-employer worksite where [Appellant]'s accident occurred and improperly removed the issue from the determination of the jury.

> 2. Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law by failing to consider, or give appropriate weight to, the terms of OSHA Directive CPL 02-00-124 and the terms of OSHA's July 20, 2012 response to inquiry in determining whether the multi-employer worksite policy should be applied to construction sites only.

3.      Irrespective of whether [RPCC] was a "controlling employer" of the subject premises pursuant to OSHA, whether the [t]rial [c]ourt abused its discretion and erred as a matter of law by apparently failing to consider [Appellant's] theory of liability under Sections 343 and 344 of the Restatement (Second) of Torts.

Appellant's Brief at 3 (suggested answers omitted).

Our review is governed by the following:

A nonsuit is proper only if the jury, viewing the evidence and all reasonable inferences arising from it in the light most favorable to the plaintiffs, could not reasonably conclude that the elements of the cause of action had been established. Furthermore, all conflicts in the evidence must be resolved in the plaintiff['s] favor. In reviewing the evidence presented we must keep in mind that a jury may not be permitted to reach a verdict based on mere conjecture or speculation. We will reverse only if the trial court abused its discretion or made an error of law.

**Gavin v. Loeffelbein**, 161 A.3d 340, 355 (Pa. Super. 2017).

The overarching question in this case is whether RPCC engaged in negligent conduct for which it may be held liable to Appellant in tort. To hold a defendant liable for negligence, the plaintiff must prove that: (1) the defendant had a legally recognized duty to conform to a standard of care; (2) the defendant breached that duty; (3) the defendant's conduct caused the resulting injury; and (4) the plaintiff incurred actual damage. **Newell v. Montana West, Inc.**, 154 A.3d 819, 822 (Pa. Super. 2017). The determinative element in this case is the first: duty. Appellant asks us to recognize a legal duty of RPCC under Pennsylvania law that is based on OSHA's enforcement policy regarding "controlling employers." We agree

with the trial court that recognition of a tort duty on that basis is inappropriate in this case and that RPCC therefore was entitled to a nonsuit.

Appellant begins his argument by citing Section 286 of the Second Restatement of Torts (1965), which states:

> **When Standard of Conduct Defined by Legislation or Regulation Will Be Adopted**
>
> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

Pennsylvania courts have used this provision to "define the standard of a 'reasonable man' by adopting standards of conduct from legislative enactments designed to protect a class of individuals." *C.C.H. v. Phila. Phillies, Inc.*, 940 A.2d 336, 347 (Pa. 2008). We therefore have looked to OSHA regulations to determine the appropriate standards applicable to erection of scaffolding, *Wood v. Smith*, 495 A.2d 601, 603-04 (Pa. Super. 1985), *appeal dismissed*, 518 A.2d 266 (Pa. 1986), and maintenance of

equipment used in a forge, **Brogley v. Chambersburg Eng'g Co.**, 452 A.2d 743, 745-46 (Pa. Super. 1962).[5]

But in looking to pronouncements from OSHA, the Supreme Court has been careful to distinguish between those setting standards of care and those that merely describe OSHA's enforcement policies. The leading case is **Leonard v. Commonwealth, Dep't of Transp.**, 771 A.2d 1238 (Pa. 2001). The plaintiff suffered injuries from a forty-foot fall while he was working for a steel erection company at a highway construction site. He sought to recover damages from the project's general contractor, asserting a breach of a duty to provide a safe workplace and, in particular, to comply with OSHA regulations regarding safety lines and nets. In that connection, he cited an OSHA regulation stating that a prime contractor and a subcontractor "shall be deemed to have joint responsibility" for safety on the job. **Id.** at 1241 (citing 29 C.F.R. § 1926.16(d)). The Supreme Court held the regulation inapplicable, explaining:

> The regulations cited by Leonard expressly state that they concern the scope of enforcement of OSHA requirements. In particular, 29 C.F.R. § 1926.16(d) states: "Where joint responsibility exists, both the prime contractor and his subcontractor or subcontractors, regardless of tier, shall be

---

[5] Appellant's reliance on **McLaughlin v. Gastrointestinal Specialists, Inc.**, 696 A.2d 173 (Pa. Super. 1997), is misplaced. We held in that case that it violated public policy to take retaliatory action against an employee who complained to her employer about workplace safety, and we cited the Occupational Safety and Health Act in reaching our conclusion. The case had nothing to do with whether there was a tort duty giving rise to a right to recovery for personal injuries.

considered subject to the *enforcement provisions* of the Act."
(Emphasis added). The fact that OSHA requirements were
applicable to the project does not, however, mean that [the
general contractor] had a presence at the site or control over the
work done by [the steel erector]. Absent those elements,
liability does not attach.

*Id.*[6]

In **Leonard**, the Supreme Court considered an OSHA regulation. Here, not even a regulation is at issue. The "controlling employer" policy on which Appellant relies is embodied only in an OSHA "compliance directive," which, as its name suggests, does no more than provide guidance to OSHA field offices about how to enforce that agency's requirements. **See**, **e.g.**, **Aguirre v. Turner Constr. Co.**, 582 F.3d 808, 814-15 (7th Cir. 2009). Generally, federal agency guidance documents do not determine rights or obligations or cause legal consequences, because, by its very nature, "guidance" is not supposed to have a binding legal effect. **See Cement Kiln Recycling Coal. v. EPA**, 493 F.3d 207, 226 n.14 (D.C. Cir. 2007) (noting that policy statements have no binding effect and leave decision makers free to exercise discretion). **See generally Nw. Youth Servs., Inc. v. Commonwealth, Dep't of Pub. Welfare**, 66 A.3d 301, 310–12, 314-16 (Pa. 2013) (discussing law relating to federal and Pennsylvania administrative guidance materials). We note that Section 286 of the Second

---

[6] We note with dismay that although **Leonard** was highlighted by the trial court in its decision, **see** Trial Ct. Op. at 8, Appellant fails to cite it in his brief.

Restatement, on which Appellant relies, discusses adoption of standards from "a legislative enactment or an administrative regulation," not a guidance document.

In any event, apart from its technical administrative status, we conclude that Compliance Directive 02-00-124 does not set forth the type of legal requirements that may be used to formulate a Pennsylvania legal duty under **Leonard**.  The Directive was issued to supplant a section of OSHA's Field Inspection Reference Manual, which "provides current information and guidance to [OSHA's] national, regional, and area offices concerning OSHA's policy and procedures for implementing inspections, issuing citations and proposing penalties."  OSHA Field Inspection Ref. Manual, at ABSTRACT-2.  The purpose of the Directive was to "clarif[y] the Agency's multi-employer **citation** policy" by giving "clearer and more detailed guidance than did the earlier description of the policy in the [Field Manual], including new examples explaining **when citations should and should not be issued** to exposing, creating, correcting, and controlling employers."  Directive 02-00-124, §§ I, IX.A (emphasis added).  The actual policy declared by the Directive states that "more than one employer **may be citable** for a hazardous condition that violates an OSHA standard."  **Id.** § X.A. (emphasis added).  It thus makes clear that it is discussing only OSHA policy regarding the issuance of administrative citations for violations of OSHA requirements.  Hence, like the regulation in **Leonard**, Compliance Directive 02-00-124 concerns only "the scope of enforcement of OSHA requirements," and its

provisions thus "do not establish liability" under Pennsylvania tort law. 771 A.2d at 1241.

Our conclusion is reinforced in this case by the limited scope that the OSHA compliance directive has been given by courts that have considered it. As the trial court explained, the directive has not been applied outside the construction industry. Trial Ct. Op. at 4-7.

The directive relates to OSHA's aim to make multiple employers responsible for a safety hazard at a worksite by stating that a "controlling employer" can be cited for an OSHA violation even though it did not actually commit the violation itself. OSHA claims authority to impose such responsibility under the Occupational Safety and Health Act, 29 U.S.C. § 654(a)(2), which says only that "[e]ach employer . . . shall comply with occupational safety and health standards promulgated under this chapter." Courts in construction cases have upheld OSHA's robust assertion of broad authority under this provision in light of the unique problems posed by construction worksites. As one court explained:

> The [multi-employer] doctrine has its genesis in the construction industry where numerous employers, often subcontractors, work in the same general area, and where hazards created by one employer often pose dangers to employees of other employers. . . .
>
> The multi-employer doctrine is particularly applicable to multi-employer construction worksites, **and in fact has been limited in application to that context**. The nature of construction requires that subcontractors work in close proximity with one another and with the general contractor at the same worksite. "In this situation, a hazard created and controlled by one employer can affect the safety of employees of other employers on the site." Rules of craft jurisdiction, however, may limit one

subcontractor's ability to abate hazards posed to its own employees that were created by another subcontractor or a general contractor. To alleviate these hazards and ensure compliance with safety standards, the general rule regarding multi-employer construction worksites is that employers will be liable under § 654(a)(2) for hazards the employer either created or controlled, regardless of whose employees are threatened by the hazard. Thus, a subcontractor that creates a hazard may be cited under (a)(2) even if its own employees are not threatened. Similarly, a general contractor, which often will not have created the hazard but will be in control of the worksite and have authority to abate the hazard, may be cited under (a)(2) if it unreasonably fails to correct a hazard it created or unreasonably fails to direct a subcontractor to correct a hazard created by the subcontractor.

*Universal Constr. Co. v. Occupational Safety & Health Rev. Comm.*, 182 F.3d 726, 728, 730 (10th Cir. 1999) (emphasis added; citations omitted).[7] But although OSHA's compliance directive states that OSHA's controlling employer policy applies "in all industry sectors," not just construction, Directive 02-00-124, § X.A,[8] no court has ever applied the

---

[7] *See also United States v. MYR Grp., Inc.*, 361 F.3d 364, 366 (7th Cir. 2004) ("since the contractor is subject to OSHA's regulations of safety in construction by virtue of being engaged in the construction business, and has to comply with those regulations in order to protect his own workers at the site, it is sensible to think of him as assuming the same duty to the other workers at the site who might be injured or killed if he violated the regulations").

[8] This was the import of the July 20, 2012 OSHA letter that Appellant sought to file with the trial court in connection with its post-trial motion. Clapp asked whether a policy on multi-employer responsibility drafted by a construction industry group would be controlling on this issue, and OSHA responded that because "[t]he multi-employer policy applies to all work places, not just construction sites," OSHA did not adopt the construction group's standards. The letter, which was not part of the record when the

*(Footnote Continued Next Page)*

directive outside of the construction context.[9]  Therefore, even if Appellant could persuade us to find the compliance directive relevant to determining RPCC's duty of care, we still would conclude that there is no ground for using it as a basis for imposing tort liability on the facts before us.

Here, as in **Leonard**, the question of RPCC's duty to Appellant therefore must be decided without regard to the OSHA policy statement.  In explaining why it granted RPCC's motion for nonsuit, the trial court engaged

*(Footnote Continued)* ————————

trial court granted the nonsuit, has no force of law and has no bearing on this case.

[9]     *See **Brennan v. Occupational Safety & Health Rev. Comm'n**, 513 F.2d 1032 (2d Cir. 1975); **Am. Petroleum Inst. v. OSHA**, 581 F.2d 493, 508-09 (5th Cir. 1978), **aff'd sub nom. Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.**, 448 U.S. 607 (1980); **R.P. Carbone Constr. Co. v. Occupational Safety & Health Rev. Comm'n**, 166 F.3d 815 (6th Cir. 1998); **United States v. Pitt-Des Moines, Inc.**, 168 F.3d 976 (7th Cir. 1999); **Marshall v. Knutson Constr. Co.**, 566 F.2d 596 (8th Cir. 1977); **Beatty Equip. Leasing, Inc. v. Sec'y of Labor**, 577 F.2d 534 (9th Cir. 1978); **Calloway v. PPG Indus., Inc.**, 155 F. App'x 450, 455 (11th Cir. 2005) (per curiam); **Ariz. Pub. Serv. Co. v. Indus. Comm'n of Ariz.**, 873 P.2d 679, 681-83 (Ariz. Ct. App. 1994); **Wendland v. Ridgefield Constr. Servs., Inc.**, 439 A.2d 954, 956 (Conn. 1981); **Presley v. Commercial Moving & Rigging, Inc.**, 25 A.3d 873, 881, 887 n.12 (D.C. 2011); **Dep't of Labor v. Hayes Drilling, Inc.**, 354 S.W.3d 131, 138-39, 140 n.3 (Ky. Ct. App. 2011) (citing **Hargis v. Baize**, 168 S.W.3d 36, 43 (Ky. 2005)); **C & M Builders, LLC v. Strub**, 22 A.3d 867, 873 n.2 (Md. 2011); **Bastian v. Carlton Cty. Highway Dep't**, 555 N.W.2d 312, 316-18 (Minn. Ct. App. 1996); **Costantino v. Ventriglia**, 735 A.2d 1180, 1181-84 (N.J. App. Div. 1999), **cert. denied**, 746 A.2d 456 (N.J. 2000); **Flores v. Infrastructure Repair Serv., LLC**, 34 N.Y.S.3d 324, 329 (N.Y. Sup. Ct. 2015); **Comm'r of Labor of N.C. v. Weekley Homes, L.P.**, 609 S.E.2d 407, 413 (N.C. Ct. App), **appeal dismissed**, 616 S.E.2d 227 (N.C. 2005); **Martinez Melgoza & Assocs., Inc. v. Dep't of Labor & Indus.**, 106 P.3d 776, 779 n.8 (Wash. Ct. App.), **review denied**, 124 P.3d 304 (Wash. 2005); **France v. S. Equip. Co.**, 689 S.E.2d 1, 15 (W. Va. 2010).

in an extensive discussion of the record to show that Appellant failed to present sufficient evidence to reach the jury on its "controlling employer" claim. That same evidentiary review reveals that there is no evidence in the record by which RPCC can be held to have assumed any duty regarding safety in the leased areas of the Market building and that it therefore breached no duty to Appellant that can give rise to a claim for negligence.[10]

RPCC's leases with its tenants, including TMK, contain no provisions under which RPCC assumes responsibility for the safety of its tenants' employees or for those employees' compliance with workplace safety standards. Rather, Paragraph 5(d) of TMK's lease states:

> Lessee, at Lessee's sole expense, shall fully comply with, and cause all of Lessee's contractors, agents, servants, sub-Subtenants, employees and licensees to comply with, all Applicable Laws, and will maintain (or cause to be maintained) all Authorizations as may be required by Applicable Laws for the lawful operation of the Premises and Lessee's use of and operations on, the Property. Without limiting the generality of the foregoing, after the Delivery Date, Lessee shall comply with the requirements of (a) all zoning, subdivision, building, land use and similar Applicable Laws; (b) the Occupational Safety and Health Act (and all regulations promulgated thereunder), (e) the Americans with Disabilities Act (and all regulations promulgated thereunder), as the same may be amended from time to time (collectively, the "ADA"); and (d) any Title Exceptions, [real estate agreements,] and Environmental Covenants.

---

[10] Although our rejection of Appellant's claim based on the OSHA compliance directive makes it unnecessary to review the trial court's decision that Appellant's evidence was insufficient to prove RPCC is a "controlling employer" under the OSHA directive, we have reviewed the evidence and agree with the trial court's conclusion that Appellant's evidence was insufficient.

The lease thus specifically required TMK to have its employees comply with all applicable OSHA regulations and to maintain all authorizations required by OSHA. The lease imposed no such requirements on RPCC, although RPCC does make sure that all of its own employees are OSHA-certified. N.T., 1/13/16 P.M., at 18-20.

RPCC's obligations under the lease were described at trial by its general manager, Daniel Kane, who explained that those obligations extend to common areas of the Market building, but not to individual leasehold areas. The trial court reviewed relevant portions of Mr. Kane's testimony in its opinion:

> RPCC's responsibilities for maintaining the concourse and other common spaces include "anything from a light bulb being out that needs to be replaced; if one of the dock doors leading outside is off track or needs to be replaced; and then we do a general sweep and scrub of the floors at the end of each day," as well as monitoring parking and admission for the public, and general sanitation and maintenance of the public concourse spaces. [N.T., 1/13/16 P.M., at] 54-55. . . .

> Mr. Kane testified that RPCC does not have the power or authority to control how tenants' employees perform their jobs, due to the lease and collective bargaining agreements. [N.T., 1/13/16 P.M., at 37]. RPCC does not have the ability to hire, fire, train, or discipline any employee of the tenants covered by the collective bargaining agreements. *Id.* [at] 58-59.

> "Employers are responsible for the safe operation of their employees on the equipment," Mr. Kane said. [N.T., 1/13/16 P.M., at] 37. RPCC relied on each of the various tenants to train its own employees, which was consistent with the union contract. "We don't have the ability to train or discipline employees that aren't ours." *Id.*

> Specifically, RPCC cannot enforce or require that tenant's employees be OSHA-certified to operate powered industrial trucks in the common areas. [N.T., 1/13/16 P.M., at] 21.

We don't — we don't control the means and methods of how the individual tenants do their business. All the employees are union employees. We're a union shop and we respect that, the chain of command that occurs within the union collective bargaining agreement which doesn't require [certification].

*****

Again, per the lease of the — with the tenants and also the collective bargaining agreement, we don't — we can't enforce or require that sort of certification amongst employees that are not our own.

[N.T., 1/13/16 P.M., at] 21.

Mr. Kane stated that the only action within RPCC's power regarding non-RPCC employees is limited to issuing a "verbal correction or reminder of sorts" if Mr. Kane saw them using a powered industrial truck unsafely while in the public concourse areas. [N.T., 1/13/16 P.M., at] 22. . . .

Mr. Kane said that RPCC's safety policies only deal with the safety of customers and the security of the Market, and not with the safety of tenant[s'] employees. . . .

Trial Ct. Op. at 13-15. The trial court also reviewed testimony by TMK's operations executives and found nothing in that testimony to contradict that of Mr. Kane. *See id.* at 16-18. Our own review of the testimony supports the trial court's conclusion. RPCC therefore did not contractually assume any duty of care toward Appellant.

Finally, his appellate brief Appellant contends that, apart from whether RPCC was a controlling employer, RPCC had a duty of care under Sections

343 and 344 of the Second Restatement of Torts. Appellant's Brief at 28.[11]

Section 343 provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> > (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> >
> > (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> >
> > (c) fails to exercise reasonable care to protect them against the danger.

Comment *a* to Section 343 states that it "should be read together with"

Section 343A, which provides:

> (1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
>
> (2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public

---

[11] Although Appellant did not raise this issue in his post-trial motion, he did raise it in his brief in support of that motion. Appellant's Br. in Supp. of His Mot. for Post-trial Relief at 19-20. Appellant's motion for post-trial relief was due prior to transcription of the notes of testimony from the trial. Appellant's Mot. for Post-trial Relief at ¶ 28. Appellant thus requested the right to supplement that motion upon receipt of the notes of testimony. *Id.* at ¶¶ 30-31. Hence, we decline to find this issue waived, even though, generally, "[i]f an issue has not been raised in a post-trial motion, it is waived for appeal purposes." *Sovereign Bank v. Valentino*, 914 A.2d 415, 426 (Pa. Super. 2006) (citations omitted).

utility, is a factor of importance indicating that the harm should be anticipated.

Section 344 provides:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

None of these Restatement provisions applies here. Appellant's accident occurred in a refrigerated portion of TMK's leased premises, not in a common area for which RPCC was responsible and in which Appellant was a business invitee. Sections 343 and 343A therefore are inapplicable. And Section 344 does not apply because a landowner's liability under that provision does not extend to protecting the employees of an independent business operating on its property as a tenant from the acts of other employees of that business. *Cf. Brletich v. U.S. Steel Corp.*, 285 A.2d 133, 135 (Pa. 1971) (independent contractor).[12] Because none of the

---

[12] We also note that there can be no liability under Section 343 unless the owner "should expect that [invitees] will not discover or realize the danger, or will fail to protect themselves against it," nor under Section 343A if the injury was caused by a known and obvious danger. *Campisi v. Acme Markets, Inc.*, 915 A.2d 117, 119 (Pa. Super. 2006) (business had no liability to customer who allegedly was injured when he tripped over cane of a blind employee, because danger was obvious); *see also Atkins v. Urban*
*(Footnote Continued Next Page)*

Restatement provisions apply, Appellant's argument based on them is without merit.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/13/2017

---

*(Footnote Continued)* ————————

***Redevelopment Auth. of Pittsburgh***, 414 A.2d 100, 103-04 (Pa. 1980) (liability depends on the obviousness of the danger and the likelihood that the invitee would realize the danger and take steps to protect himself).