J-A24043-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RYAN FELL MORTIMER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL ANDREW MCCOOL, | : | |
| RAYMOND CHRISTIAN MCCOOL, | : | |
| ESTATE OF RAYMOND R. MCCOOL, | : | No. 3583 EDA 2018 |
| AND MCCOOL PROPERTIES, LLC | : | |
| | : | |
| | : | |
| APPEAL OF: RYAN FELL-MORTIMER | : | |

Appeal from the Judgment Entered November 30, 2018
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 2012-10523-MJ

| | | |
|---|---|---|
| RYAN FELL MORTIMER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| 340 ASSOCIATES, LLC AND MCCOOL | : | |
| PROPERTIES, LLC | : | |
| | : | No. 3585 EDA 2018 |
| | : | |
| APPEAL OF: RYAN FELL-MORTIMER | : | |

Appeal from the Judgment Entered November 30, 2018
In the Court of Common Pleas of Chester County Civil Division at No(s):
No. 2012-02481-IR

BEFORE:   BENDER, P.J.E., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                 **FILED DECEMBER 12, 2019**

---

[*] Retired Senior Judge assigned to the Superior Court.

Appellant, Ryan Fell Mortimer, appeals from the judgment entered on November 30, 2018, in favor of Appellees, Michael Andrew McCool ("Andy"), Raymond Christian McCool ("Chris") (collectively, "the Brothers"), the Estate of Raymond R. McCool ("the Estate"), McCool Properties, LLC ("McCool Properties"), and 340 Associates, LLC ("340 Associates"). We affirm.

The trial court found[1] that 340 Associates is a limited liability company formed in 2001 to purchase and hold a liquor license ("License"); it purchased the License on March 25, 2002, with the approval of the Pennsylvania Liquor Control Board ("PLCB"). Trial Court Opinion ("TCO"), filed February 25, 2019, at 3-5. The trial court also found that, at the time of the formation of 340 Associates, its members were Charles O'Neill and the Brothers, but O'Neill departed in 2002, leaving the Brothers as the only members and managers of operations of 340 Associates. According to the trial court: "On January 1, 2003, Chris and Andy signed a new operating agreement for 340 Associates. The operating agreement identified Chris and Andy as each having a 50% membership and as the managers." *Id.* at 5. The trial court further found that the Brothers' father, Raymond R. McCool ("Ray"), was never a member of 340 Associates. *Id.* at 6.

In 2001, the Brothers and O'Neill also formed TA Properties as a Pennsylvania limited liability company. *Id.* at 3.

---

[1] As discussed in greater detail below, the findings of the trial court about the formation, members, and assets of 340 Associates are disputed by Appellant.

- 2 -

McCool Properties, is a limited liability company formed on March 17, 2004. *Id.* at 5. "The operating agreement signed June 1, 2004 identified McCool Properties' members as Ray, Chris and Andy." *Id.* Based on this operating agreement, the trial court found that "McCool Properties is not a member of 340 Associates" but "a separate entity." *Id.* at 6. "On or about July 7, 2004, all of TA Properties' assets . . . were transferred to McCool Properties." *Id.* at 5. These assets included a six-story building located at 336-340 East Lincoln Highway, Coatesville, Pennsylvania, with a restaurant, bar, and convenience store on the first floor ("the Property"). *Id.* at 2-3.

Appellant is a judgment creditor of 340 Associates, "as the result of being seriously and permanently injured when a drunk driver crashed into her vehicle on March 15, 2007." *Id.* at 1. The "intoxicated driver . . . had been served alcohol by employees of the Famous Mexican Restaurant ('Famous Restaurant'), located in part of the [Property]. Nazario Tapia and Rosa Tapia leased space from McCool Properties . . . for the restaurant . . . paying $3,600 per month [for] rent." *Id.* at 2, 20. "Mr. Tapia had a management agreement with 340 Associates for the use of [the License ('the Management Agreement').[2]] As the holder of the License, 340 Associates was the licensee." *Id.* at 2; *see also* Exhibit P-21.

> [In November 2007, Appellant] sued for the damages she sustained in the motor vehicle [collision] in a civil action known as ***Fell v. Villava-Martinez***, [Chester County Court of Common

---

[2] On December 17, 2004, the PLCB had "approved Mr. Tapia as manager of the License." TCO at 5.

Pleas] No. 2007-10827 [("the dram shop action")]. Following trial, the jury awarded [Appellant] damages in the sum of $6.8 million . . . against ten defendants, including 340 Associates. No other defendant in the within matter was a defendant in the dram shop action. The liquor licensing laws impose joint and several liability, making 340 Associates liable for the full amount of damages award.

TCO at 2-3; *see also Fell v. 340 Associates, LLC*, 125 A.3d 75, 77 (Pa. Super. 2015).

Ray died on October 4, 2009, and his interest in McCool Properties passed to the Estate. TCO at 6.

After obtaining a judgment against [340] Associates in the dram shop action, [Appellant] was unable to execute against the License because [340] Associates had transferred the [L]icense to a third-party, 334 Kayla, Inc. ("Kayla"). [Appellant] successfully prosecuted a civil action under the Pennsylvania Uniform Fraudulent Transfers Act, 12 Pa.C.S.A. §[§] 5101-5110 ("PUFTA"), against 340 Associates and Kayla. [Chester County Court of Common Pleas Docket Number 2011-10055 ("the PUFTA Action").] The fraudulent transaction involved 340 Associates transferring License to Kayla for $75,000 [in February 2010]. 340 Associates took back a note for the full purchase price. At the same time, Kayla entered into a lease with McCool Properties for the commercial space at the Property. At the lease's expiration, Kayla was required to transfer the License to McCool Properties or the assignee for market value. In addition, the License served as security for the Lease. Kayla was restricted and could not sell, transfer, pledge or assign the License during the term of the Lease. Upon review, the Superior Court determined 340 Associates had distributed its only asset, leaving it incapable of discharging its debts, which conduct violated [PUFTA]. [Appellant] was awarded and then sold the License for $415,000, which sum was applied to the judgment.

*Id.* at 2-3; *see also Fell v. 340 Associates*, 125 A.3d at 76–78.[3]

_____

[3] Appellant "executed on the License during the second-half of 2016[.]" Decision, 4/20/2018, "Findings of Fact" ¶ 35.

- 4 -

On March 8, 2012, Appellant commenced an action against 340 Associates and McCool Properties at Chester County Court of Common Pleas Docket Number 2012-02481. The complaint sought to pierce the corporate veil of 340 Associates in order to hold McCool Properties liable for the remainder of the judgment owed to Appellant by 340 Associates from the dram shop action.

On October 3, 2012, Appellant commenced a second action against the Brothers, the Estate, and McCool Properties at Chester County Court of Common Pleas Docket Number 2012-10523. The second complaint is nearly identical to the first complaint and likewise sought to pierce 340 Associates' corporate veil in order to hold the Brothers, the Estate, and McCool Properties liable for the remainder of the judgment owed to Appellant by 340 Associates. On May 28, 2014, the two actions were consolidated.

"A five-day bench trial commenced March 19, 2018 and ended March 26, 2018." TCO at 1.

During the trial, Appellant's real estate expert testified that the maximum monthly rent that McCool Properties should have been charging the Tapias was $2,000.00. N.T. at 45. Appellant's accounting expert testified:

> There was deposition testimony by the McCools that said that in the bar, there was a safe. That the safe contained the cash payments that were received by the managers of the apartment building and some of that cash was used to pay bonuses.
>
> In my mind, there was a question as to whether all of that cash had been reported.

*Id.* at 103.

- 5 -

The Brothers testified as if on cross-examination during Appellant's case-in-chief. TCO at 16; N.T. at 213-366. "Both testified that Ray and subsequently [the] Estate had never been a member of 340 Associates." TCO at 16.

During Chris's testimony, Appellant admitted the Petition for Probate and Grant of Letters for the Estate to the Register of Wills of Chester County ("Petition for Probate"). Exhibit P-11A.[4] Attached to the Petition for Probate was Form REV-1500, the Inheritance Tax Return form filed pursuant to Ray's death. Exhibit P-11A at 13. Attached thereto was an undated, unsigned, one-page document stating, in its entirety:

> There are no Operating Agreements available for:
>
> RCM Associates
>
> MAC Real Estate, LLC
>
> 340 Associates, LLC

*Id.* at 88.

_____

[4] One page attached to the Petition for Probate, entitled "Assignment," in which Ray stated that he was transferring his ownership interest in 340 Associates to the Raymond R. McCool Revocable Agreement of Trust No. 1, Exhibit P-11A at 62, was excluded by the trial court from the admitted exhibit on the basis of hearsay, since the "Assignment" was prepared by Ray himself, who was deceased and could not authenticate nor explain it. N.T. at 323, 370.

Additionally, 340 Associates' "operating agreement was entered into evidence in [Appellant]'s case." TCO at 16; **see also** Exhibit P-77;[5] N.T. at 326 (operating agreement marked as Exhibit P-77), 376 (admitted). Exhibit P-77 is entitled the "Limited Liability Company Operating Agreement for 340 Associates, LLC". Paragraph 1.8 of the operating agreement states, in its entirety: "**THE MEMBERS.** The name and place of residence of each member are contained in [Attachment[6]] 2 attached to this Agreement." Exhibit P-77, Operating Agreement ¶ 1.8. Attachment 2 to the operating agreement is dated January 1, 2003, and is entitled "Listing of Members", identifying "Andrew McCool" and "Christian McCool" as 50% members, with no other names recorded. **Id.** at Attachment 2. The Certificate of Formation attached to the end of the operating agreement is also dated January 1, 2003, and is signed only by "Andrew McCool" and "R. Christian McCool." **Id.** at Certificate of Formation. Additionally, Paragraph 1.9 of the operating agreement states: "no additional members may be admitted to the Company through Issuance by the company of a new interest in the Company, without the prior unanimous written consent of the Members." **Id.**, Operating Agreement ¶

---

[5] In the certified record, part of the label on this exhibit is missing, reading only "iff's bit 7". However, as it appears in the record between Exhibit P-75 and Exhibit P-78, with no indication in the record that an Exhibit P-76 was ever admitted, we accept that this document is Exhibit P-77.

[6] The text actually reads "Exhibit 2"; however, to avoid confusion with the labelling of the trial exhibits, we have chosen to substitute "Attachment 2" for "Exhibit 2".

1.9. Ray is not named anywhere in the operating agreement. ***See generally id.***

The Brothers also testified that every tax return filed for 340 Associates between 2003 and 2007 that identified Ray as a member of 340 Associates "was erroneous and reflected a mistake." TCO at 16.

> Chris explained that Ray had provided information about his membership in 340 Associates to the accountants and was simply wrong[ and that these r]eturns were amended when the mistake was discovered. Additionally, Chris testified that he was mistaken in 2011 when he said Ray was a member for 340 Associates in a deposition.

***Id.***

At the conclusion of Appellant's case-in-chief, the Estate moved for nonsuit, arguing that 340 Associates' operating agreement from 2003 demonstrated that Ray was not a member of 340 Associates. N.T. at 377, 384-85. Appellant was given the opportunity to argue against nonsuit but never asserted that the operating agreement was backdated or otherwise falsified. ***Id.*** at 386-87. The trial court "grant[ed] the motion for compulsory nonsuit with respect to the [E]state[.]" ***Id.*** at 388; ***see also*** TCO at 1.

The remaining defendants then presented the expert testimony of real estate appraiser Daniel Knezevich, attorney Patrick Stapleton, and forensic accountant Gregory Cowhey. N.T. at 542, 590, 761. Knezevich had performed a fair market rental study of the rents paid for commercial space at the Property and testified that the $3,600.00 per month that the Tapias were paying to McCool Properties in rent for commercial space at the Property

was a fair market rate and that the License was immaterial to his calculation

of the fair market rate for rent since the License was not part of the real estate.

*Id.* at 545, 550; TCO at 20.

> Stapleton . . . testif[ied] as an expert on liquor law and business structures used in the liquor industry in Pennsylvania. Mr. Stapleton served on the [PLCB] for fourteen years, five as chair, and had returned to private legal practice approximately five years earlier. Mr. Stapleton devotes nearly half of his practice [to] liquor law, including counseling clients regarding business structures. Mr. Stapleton testified that 340 Associates could have required Mr. Tapia, as manager, to pay a fee for use of the License. The PLCB regulations do not address such a fee, so a licensee and manager are free to negotiate mutually acceptable terms. Mr. Stapleton testified that not all of his clients who are licensees charge for use of their licenses and that it was not uncommon for clients who had purchased a license for investment only to enter into a similar, no payment arrangement with a manager.

TCO at 20; *see also* N.T. at 590, 613.

> Cowhey testified about the "capital adequacy" of 340 Associates:
>
> There is no significant cash flow obligations because under the [M]anagement [A]greement, the manager is responsible for the purchase and sale of the liquor, and then what flows through to 340 Associates is the obligation to collect from the manager and then to remit to the State the sales tax on the food sales.

N.T. at 786-87.

> A decision was entered in favor of remaining [Appellees] on April 19, 2018. [Appellant] filed two motions for post-trial relief. The first, filed April 3, 2018, requested removal of the non-suit [and argued, for the first time, that 340 Associates' operating agreement was backdated]. The second, filed April 30, 2018, sought relief from the decision. On November 6, 2018, all post-trial relief was denied. [Appellant] timely filed an appeal and subsequently filed a statement of errors complained of on appeal[.]

TCO at 1-2; **see also id.** at 16.

Appellant now presents the following issues for our review:

1.      Whether the trial court erred as a matter of law when it refused to pierce the corporate veils of 340 Associates and McCool Properties, and hold these alter ego companies and their individual owners, [the Brothers and Ray] liable for [Appellant]'s judgment against 340 Associates, because the trial court's findings were unsupported by competent evidence or premised on an error of law that:

a)      340 Associates and McCool Properties had different owners and the trial court is collaterally estopped from finding that Ray[] owned 340 Associates;

[b)]    340 Associates was not undercapitalized for its acceptable purpose of being a "shell" company that owns a dangerous bar and its liquor license without providing any oversight of the bar operations and without earning any money off the bar business, but instead delegates all responsibility and profit to its bar "manager," who, in turn, pays McCool Properties flat inflated monthly rent;

[c)]    the McCools did not further their personal interests through their misuse of corporate forms and may shield themselves from liability pursuant to the advantages of the corporate form they selected[;]

[d)]    the frauds proven do not demonstrate the individual McCools used their *corporate forms* to perpetrate a fraud or other illegality, therefore the McCools are entitled to shield themselves from liability for [Appellant]'s judgment; [and]

[e)]    McCool Properties did not fund or otherwise pay for 340 Associates' liquor license or its expenses[.]

2.      Whether the trial court's findings are unsupported by competent evidence and whether it misapplied the law in concluding that, even if the court were to apply the "enterprise" or "single entity" theory factors to these actions, McCool Properties may not be held liable for [Appellant]'s judgment against 340 Associates?

Appellant's Brief at 2-4 (emphasis in original) (issues re-ordered to facilitate disposition) (trial court's answers omitted).

Preliminarily, we note: "Pennsylvania carries a strong presumption against piercing the corporate veil. The corporate entity should be upheld unless specific, unusual circumstances call for an exception." *Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 816 (Pa. Super. 2017) (citation omitted).

In the current action, Appellant contends that the trial court erred by refusing to pierce the corporate veil of 340 Associates in order to reach the assets of the Estate, the Brothers, and McCool Properties. Appellant's Brief at 29. We will consider her arguments relating to each in turn.

**The Estate**

*Standard of Review*

The Estate was dismissed from this action pursuant to a nonsuit. N.T. at 388; TCO at 1. Our standard of review for a nonsuit is as follows:

> A nonsuit is proper only if the [fact-finder], viewing the evidence and all reasonable inferences arising from it in the light most favorable to the plaintiffs, could not reasonably conclude that the elements of the cause of action had been established. . . . We will reverse only if the trial court abused its discretion or made an error of law.

*Kovacevich v. Regional Produce Cooperative Corp.*, 172 A.3d 80, 85 (Pa. Super. 2017) (citation omitted) (some formatting).

### *What Assets are Reached by Piercing the Corporate Veil?*

In Pennsylvania, unlike in some other jurisdictions,[7] the corporate veil is only allowed to be pierced to access the assets of the corporation's shareholders or, as here, the limited liability company's members;[8] this concept is known as the "alter ego theory" of piercing the corporate veil.[9] *Lomas v. Kravitz*, 130 A.3d 107, 126 (Pa. Super. 2015) (*en banc*) ("Piercing the corporate veil provides a means of assessing liability for the acts of a corporation **against an equity holder** in the corporation." (emphasis added) (citation and internal quotation marks omitted)), *aff'd*, 170 A.3d 380 (Pa. 2017); *Mark Hershey Farms*, 171 A.3d at 816 ("when it is appropriate to pierce the corporate veil, **it is the shareholder, and not some other entity,**

---

[7] *E.g.*, California (*Toho-Towa Co. v. Morgan Creek Productions, Inc.*, 159 Cal. Rptr. 3d 469 (Cal. Ct. App. 2013)); Indiana (*Reed v. Reid*, 980 N.E.2d 277, 302 (Ind. 2012); *Smith v. McLeod Distributing, Inc.*, 744 N.E.2d 459, 463 (Ind. Ct. App. 2000)); Illinois (*Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 102 (Ill. 1981); *Gillespie Community Unit School District No. 7, Macoupin County v. Union Pacific Railroad Co.*, 43 N.E.3d 1155, 1180 (Ill. Ct. App. 2015)); and Louisiana (*Ames v. Ohle*, 219 So. 3d 396 (La. Ct. App. 2017); *Southern Capitol Enterprises, Inc. v. Coneco Services, LLC*, 476 F. Supp. 2d 589, 595-96 (M.D. La. 2007) (citing *Green v. Champion Insurance Co.*, 577 So. 2d 249, 257–58 (La. Ct. App.), *writ denied*, 580 So. 2d 668 (La. 1991))).

[8] "Any business that may be conducted in a corporate form may also be conducted as a partnership or a limited liability company[,]" 15 Pa.C.S. § 8102(a)(1), and "in the appropriate case the doctrine of piercing the corporate veil will be applied to a limited liability company." *Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC*, 846 A.2d 1264, 1281 n.11 (Pa. Super. 2004).

[9] The trial court applied the alter ego theory when rendering its decision. TCO at 6.

**who is held liable**" (emphasis added) (citation omitted)); *Allegheny Energy Supply Co. v. Wolf Run Mining Co.*, 53 A.3d 53, 58 n.7 (Pa. Super. 2012) ("the alter ego theory which requires proof (1) **that the party exercised domination and control over corporation**; and (2) that injustice will result if corporate fiction is maintained despite unity of interests between corporation and its principal" (emphasis added) (citation omitted)); *Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC*, 846 A.2d 1264, 1278 (Pa. Super. 2004) ("[t]he alter ego theory . . . is applicable when the individual or corporate owner controls the corporation to be pierced and **the controlling owner is to be held liable**"; "[t]he alter ego theory is available whenever one party seeks to hold **the corporation owner** liable for any claim or debt" (emphasis added) (citation and internal brackets and quotation marks omitted)). In other words, the assets available when a corporate veil is pierced are only those of the individuals or businesses that have an ownership interest in the company to be pierced.

Accordingly, whether the assets of the Estate are available to Appellant if the corporate veil of 340 Associates were pierced depends upon whether Ray (and, in turn, the Estate) was a member of 340 Associates at the time of

the collision.[10]  The trial court found that Ray was never a member of 340 Associates.  TCO at 15-17.  Appellant disagrees.  Appellant's Brief at 36.

*Brief Overview of the Law of Limited Liability Companies*

In order to determine who is a member of a limited liability company, we must first provide a brief overview of limited liability company law in our Commonwealth.  Pennsylvania law concerning limited liability companies is governed by the Uniform Limited Liability Company Act of 2016.  15 Pa.C.S. §§ 8811-8898.  Although enacted in 2016, the Act governs all limited liability companies as of April 1, 2017, irrespective of when the company was established, **id.** § 8811(c), and thus controls 340 Associates, which was formed in 2001.  TCO at 3.

A limited liability company's "operating agreement governs relations among the members as members and between the members and the limited liability company[.]"  15 Pa.C.S. § 8815(a).  "A limited liability company is as much a creature of contract as of statute."  Committee Comment to 15 Pa.C.S. § 8815.

"If a limited liability company is initially to have more than one member, those persons become members as agreed by those persons and the organizer before the formation of the company."  15 Pa.C.S. § 8841(b).

---

[10] It is undisputed that the Brothers were members of 340 Associates, and, consequently, we will not need to engage in any analysis of whether their personal assets would be available to Appellant if the evidence supports piercing 340 Associates' corporate veil.

After formation of a limited liability company, a person becomes a member:

(1) by action of the organizer if the company does not have any members;

**(2) as provided in the operating agreement;**

(3) as the result of a transaction effective under Chapter 3 (relating to entity transactions);

**(4) with the affirmative vote or consent of all the members;** or

(5) as provided in section 8871(a)(3) (relating to events causing dissolution).

*Id.* § 8841(d) (emphasis added).  Again, a "limited liability company is in part a creature of contract[.]"  Committee Comment to 15 Pa.C.S. § 8841(d).

### *What Evidence May be Considered*

Initially, we note that, in support of its claim that Ray was a member of 340 Associates, Appellant has relied upon evidence introduced by Appellees. Appellant's Brief at 37-40 (citing N.T. at 408, 417-18, 426, 431, 523, 526, 529-30).  However, the Estate was dismissed from this action pursuant to a nonsuit, N.T. at 388; TCO at 1, and, in deciding a nonsuit, "the court must consider only plaintiff's evidence as if no evidence had been introduced by the defendant."  Comment to Pa.R.C.P. 230.1 (quoting **Harnish v. School District of Philadelphia**, 732 A.2d 596, 599 (Pa. 1999)).  Accordingly, we cannot consider any of the evidence cited by Appellant that was introduced at trial by Appellees.

Without this evidence, Appellant's remaining argument in her brief is that 340 Associates' operating agreement was backdated and did not exist as

of the time of the collision in 2007. Appellant's Brief at 39. However, Appellant never alleged that the operating agreement was backdated during oral argument on the Estate's motion for nonsuit. N.T. at 386-87. Appellant suggested this backdating for the first time in her post-trial motion. TCO at 16. "A party may not, at the post-trial motion stage, raise a new theory which was not raised during trial." *E.S. Management v. Yingkai Gao*, 176 A.3d 859, 864 (Pa. Super. 2017). Any claim that the operating agreement was backdated to support a contention that the nonsuit against the Estate was improper is therefore waived.

Assuming it were not waived, the evidence of this alleged backdating that Appellant relies upon in her brief consists of a letter from 340 Associates' attorney in the dram shop action dated June 23, 2009 and a single-page attachment to the Pennsylvania inheritance tax return filed pursuant to Ray's death, Exhibit P-11A at 88. Appellant's Brief at 39.

The letter, allegedly from 340 Associates' dram shop action counsel, does not appear amongst the exhibits included in the certified record.[11] Although Appellant has included the letter in her reproduced record,

> [a]n appellate court may consider only the facts which have been duly certified in the record on appeal. *Commonwealth v. Young*, 456 Pa. 102, 115, 317 A.2d 258, 264 (1974). All involved in the appellate process have a duty to take steps necessary to

---

[11] This Court's Prothonotary contacted the Chester County Office of the Prothonotary and the chambers of the Honorable Edward Griffith, and neither the Chester County Prothonotary nor the trial judge's chambers were able to provide a copy of the June 2009 letter.

assure that the appellate court has a complete record on appeal, so that the appellate court has the materials necessary to review the issues raised on appeal. Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials. *See, e.g.*, *Commonwealth v. Williams*, 552 Pa. 451, 460, 715 A.2d 1101, 1106 (1998) (addressing obligation of appellant to purchase transcript and ensure its transmission to the appellate court).

Note to Pa.R.A.P. 1921. Ultimate responsibility for the letter appearing in the certified record thus rested with Appellant as the party raising the issue that required this Court access to that letter. *Id.* As we may consider only the facts from the duly certified record, *id.*, we cannot consider the letter, and, hence, assuming *arguendo* that Appellant's assertion that the operating agreement did not exist in 2007 were not waived, the only evidence of record supporting Appellant's contention is an undated, unsigned, single page with a word count of 16 words, which was part of an attachment to an attachment to an exhibit. Exhibit P-11A at 88.

### *Evidence of Record was Sufficient for the Trial Court to Conclude that Ray was Never a Member of 340 Associates*

Appellees presented sufficient evidence of record to establish that the Brothers were the only members of 340 Associates at the time of and after the 2007 collision and that Ray was never a member of 340 Associates. Membership in a limited liability company is determined by the members themselves. At the formation of the company, "persons become members as agreed by those persons[.]" 15 Pa.C.S. § 8841(b). With the exception of a few limited circumstances that are not relevant to the current facts, after the

formation of the company, members can only be added "as provided in the operating agreement" and/or "with the affirmative vote of all the members[.]" *Id.* § 8841(d)(2), (4). In the current appeal, the Brothers -- the two undisputed members of 340 Associates – "testified that Ray and subsequently [the] Estate had never been a member of 340 Associates. The operating agreement requires written consent of its members to admit a new member." TCO at 16; *see also* Exhibit P-77, Operating Agreement at ¶ 1.9. Since membership in a limited liability company is determined by the members themselves, where, as here, there is no evidence that, at the time of formation, any agreement existed amongst the undisputed members that Ray would be a member of 340 Associates, 15 Pa.C.S. § 8841(b), and no evidence that Ray was subsequently added as a member by the existing members' vote or written consent as provided by 340 Associates' operating agreement, *id.* § 8841(d)(2), (4), Appellant has failed to provide any evidence that Ray was a member of 340 Associates. *See* Exhibit P-77, Operating Agreement at ¶¶ 1.8-1.9, Attachment 2 & Certificate of Formation; *see generally* Exhibit P-77.

As the trial court emphasized: "Whether a person is a member or not of a limited liability company is a contractual matter pursuant to the operating agreement." TCO at 16. This statement aligns with the Committee Comments in Uniform Limited Liability Company Act of 2016. *See* Committee Comment to 15 Pa.C.S. § 8815 ("A limited liability company is as much a creature of

contract as of statute."); Committee Comment to 15 Pa.C.S. § 8841(d) (a "limited liability company is in part a creature of contract"). No matter what other evidence Appellant may have introduced or attempted to introduce, "[t]he operating agreement is conclusive evidence of the identity of the membership of 340 Associates." TCO at 16; **see also** Exhibit P-77, Operating Agreement ¶ 1.8, Attachment 2 & Certificate of Formation. **See** 15 Pa.C.S. § 8815(a)(1) ("the operating agreement governs relations among the members as members and between the members and the limited liability company").

To the extent that the trial court considered any other evidence about the members of 340 Associates beyond the operating agreement itself and the Brothers' testimony about 340 Associates' members, the trial court, as fact-finder, was unpersuaded that it should be given any significant weight— and certainly not more weight than the terms of the operating agreement or the Brothers' testimony about 340 Associates' membership:

> [Although] Ray was identified on 340 Associates' tax returns for 2003-2007 as a one-third member [and] on the inheritance tax return . . . documents filed [for the] Estate as a one-third member of 340 Associates [and] Chris or Andy signed the tax returns on which Ray is designated a one-third member of 340 Associates[,] Chris and Andy testified that every return was erroneous and reflected a mistake. Chris explained that Ray had provided information about his membership in 340 Associates to the accountants and was simply wrong. Returns were amended when the mistake was discovered. Additionally, Chris testified that he was mistaken in 2011 when he said Ray was a member of 340 Associates in a deposition. Having considered the totality of this evidence, [the trial court] concluded that certain mistakes were made due to a lack of oversight, inattentiveness or overconfidence

- 19 -

that Ray was performing correctly; however, [the trial court] found the operating agreement to be conclusive on the issue of membership of 340 Associates.

TCO at 16.

Moreover, Appellant has provided us with no law that tax returns and inheritance documents may be considered at all when determining that the members of a limited liability company, let alone that they deserve greater weight than the company's operating agreement or the testimony of the undisputed members about the company's membership. **See** Appellant's Brief at 36-45.

### Whether the Trial Court was Collaterally Estopped from Finding that Ray Owned 340 Associates is Irrelevant

Finally, Appellant represents that "the trial court was not collaterally estopped from finding that Ray[] owned 340 Associates" by "its prior factual finding in the PUFTA [A]ction[.]" Appellant's Brief at 43.[12]

Yet, even if all of the findings from the PUFTA Action about the membership of 340 Associates are ignored, for the reasons given above, Appellees still presented sufficient evidence at the trial in the current case to establish that the Brothers were the only members of 340 Associates at the time of and after the 2007 collision and that Ray was never a member of 340

---

[12] "The phrase 'collateral estoppel,' also known as 'issue preclusion,' means that when an issue of law, evidentiary fact, or ultimate fact has been determined by a valid and final judgment, that issue cannot be litigated again between the same parties in any future lawsuit." **Commonwealth v. States**, 891 A.2d 737, 742 (Pa. Super. 2005), *aff'd*, 938 A.2d 1016 (Pa. 2007).

Associates. Thus, whether the trial court was collaterally estopped from finding Ray owned 340 Associates is of no moment.

\* \* \*

Accordingly, Ray was never a member of and had no ownership interest in 340 Associates, and, therefore, the Estate's assets would not be available to Appellant even if other evidence establishes that the corporate veil of 340 Associates should be pierced. **See Mark Hershey Farms**, 171 A.3d at 816; **Allegheny Energy Supply**, 53 A.3d at 58 n.7; **Advanced Telephone Systems**, 846 A.2d at 1278. The trial court thus did not abuse its discretion nor make an error of law in granting nonsuit in favor of the Estate. **See Kovacevich**, 172 A.3d at 85.

**The Brothers**

*Standard of Review*

The trial court entered a verdict in favor of the Brothers. TCO at 1. Our standard for reviewing non-jury verdicts is as follows:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary.

***Ferraro v. Temple University***, 185 A.3d 396, 401 (Pa. Super. 2018) (citation omitted), *reargument denied* (June 27, 2018)***.***

<u>*Factors to Consider When Deciding Whether to Pierce the Corporate Veil*</u>

Unlike Ray, there is no dispute that the Brothers are members of 340 Associates and that their personal assets would be available to Appellant if it is determined that piercing 340 Associates' corporate veil were appropriate. Exhibit P-77, Operating Agreement ¶ 1.8, Attachment 2 & Certificate of Formation; TCO at 3-6, 16.

Unfortunately, "there appears to be no clear test or well settled rule in Pennsylvania ... as to exactly when the corporate veil can be pierced and when it may not be pierced." ***Fletcher-Harlee Corporation v. Szymanski***, 936 A.2d 87, 95 (Pa. Super. 2007) (citations and internal quotation marks omitted).[13] The Supreme Court of Pennsylvania's latest decision on piercing the corporate veil stated: "The corporate veil will be pierced and the corporate form disregarded whenever justice or public policy demand, such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime." ***Commonwealth by Shapiro v. Golden Gate National Senior Care LLC***, 194 A.3d 1010, 1035 (Pa. 2018). Most recently, this Court has stated:

---

[13] The Pennsylvania Association for Justice has filed an *amicus curiae* brief arguing, in part, that "there should be a clear test and a well settled rule." *Amicus Curiae* Brief at 16.

> In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder. Thus, we inquire . . . whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own.

*Mark Hershey Farms*, 171 A.3d at 816 (emphasis omitted) (citations omitted). This Court's latest *en banc* panel to address what factors a court should consider when deciding whether to pierce the corporate veil asserted: "We consider the following factors when determining whether to pierce the corporate veil: (1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and personal affairs, and (4) use of the corporate form to perpetrate a fraud." *Lomas*, 130 A.3d at 126 (citing *Lumax Industries, Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995)).

*Undercapitalization*

We first consider whether 340 Associates is undercapitalized. *See id.* Appellant argues that 340 Associates "was undercapitalized and insolvent in part because of its contingent liabilities." Appellant's Brief at 54. After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned analysis of the Honorable Edward Griffith, we find Appellant's argument to be unpersuasive. The trial court opinion comprehensively discusses and properly disposes of this consideration:

- 23 -

340 Associates was formed to hold the License. Once the PLCB approved the transfer of the License . . . to 340 Associates, the License was contributed to 340 Associates by its members. A capital contribution is an accepted method of capitalizing a limited liability company.[14] The [M]anagement [A]greement provided for the manager of the License[, Mr. Tapia,] to pay all expenses associated with maintaining the License. The food sales tax was a pass-through, paid by the manager to 340 Associates and then paid by 340 Associates to the taxing authority. [N.T. at 787.] The remainder of the expenses, such as licensing fees, [other] taxes, and liquor costs, were required to be paid by the manager. If funds were advanced to pay an expense, the manager was obligated to make reimbursement. A limited liability company need be capitalized adequately only for the purposes of its operation and is not required to have excess capital for all possible contingencies. ***Miller v. Brass Rail Tavern, Inc.***, 702 A.2d 1072, 1076 (Pa. Super. Ct. 1997)(failure of corporation to have sufficient assets to pay dram shop action judgment does not mandate a finding that the business was undercapitalized). 340 Associates always held a valuable asset, the License, which could have been sold at any time and was, in fact, transferred to [Appellant] to partially satisfy the judgment she holds. The evidence supports the conclusion that 340 Associates was adequately capitalized for the purposes of its operation from the time of its formation.

TCO at 18.[15]

_____

[14] ***See*** 15 Pa.C.S. § 8842:

A contribution may consist of:

(1) property transferred to, services performed for or another benefit provided to the limited liability company;

(2) an agreement to transfer property to, perform services for or provide another benefit to the company; or

(3) any combination of items listed in paragraphs (1) and (2).

[15] Within Appellant's argument about 340 Associates' undercapitalization, she refers to "the fact that The Famous [Restaurant] did not have liquor liability

## *Corporate Formalities*

Appellant does not contend that the Brothers failed to observe corporate formalities.[16]  ***See*** Appellant's Brief at 45-71; ***see also Lomas***, 130 A.3d at

_____

insurance" and "the McCools intentionally providing no oversight to the bar operations[.]"  Appellant's Brief at 54, 61.  Although we do not wish to excuse poor oversight and inadequate insurance by any holder of a liquor license, there is no obvious connection between this behavior and the company's alleged undercapitalization.

[16] In any event, a failure to adhere to corporate formalities is of less significance when determining whether to pierce the veil of a limited liability company, like 340 Associates, than that of a corporation.  According to 15 Pa.C.S. § 8106:

> The failure of a . . . limited liability company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a partner, member or manager of the entity for a debt, obligation or other liability of the entity.

The Committee Comment to 15 Pa.C.S. § 8106 further explains:

> This section pertains to the equitable doctrine of "piercing the veil"-*i.e.*, conflating an entity and its owners to hold one liable for the obligations of the other.  The doctrine of "piercing the corporate veil" is well-established, and courts regularly (and sometimes almost reflexively) apply that doctrine to limited liability companies and other unincorporated entities.  In the corporate realm, "disregard of corporate formalities" is a key factor in the piercing analysis.  In the realm of limited liability companies, that factor is inappropriate, because informality of organization and operation is both common and desired.  ***See e.g. Rest. of Hattiesburg, LLC v. Hotel & Rest. Supply, Inc.***, 84 So. 3d 32, 42 (Miss. Ct. App. 2012) (recognizing that "an LLC imposes much less formalities on its members than a corporation" and stating that "[t]he traditional lack of formalities--failure to conduct regular meetings, failure to appoint officers and directors, etc.--does not necessarily signal LLC abuse"). . . . The formalities

126; **Mark Hershey Farms**, 171 A.3d at 816. Assuming Appellant had addressed this factor, pursuant to our review of the record, we would agree with the trial court that: "340 Associates was attentive to the formalities of a limited liability company in that the company had a certificate of organization and an operating agreement, filed federal income tax returns, kept bookkeeping records, and maintained a separate bank account." TCO at 19.

### Intermingling of Assets and Affairs

The subsequent consideration is whether the Brothers have "used the assets of the corporation as if they were [their] own" or "substantial[ly] intermingle[ed] corporate and personal affairs[.]" **See Lomas**, 130 A.3d at 126; **Mark Hershey Farms**, 171 A.3d at 816.

Appellant argues that the Brothers "improperly furthered their personal interests through the use of their company forms." Appellant's Brief at 66; **see also id.** at 71 (contending that the Brothers "present . . . a compelling example of how corporate forms can be abused to further their own personal interest"). Appellant's argument is a bit muddled, but she appears to maintain that the Brothers were receiving unreported income by concealing a fee for leasing the License -- that should have gone to 340 Associates directly -- within inflated rent payments from the Tapias to McCool Properties. **Id.** at

---

at issue are the process formalities of governance-both those few created by this title and however few or many might be created by the organic rules.

66, 68-70. As evidence, Appellant points to "uncertainty around the amount of cash rent that was reported as received on McCool Properties['] tax return[.]" *Id.* at 71 (citing N.T. at 103-04). She also believes that the trial court should have given greater weight to the evidence of her real estate expert. *Id.* at 68.

However, Knezevich testified that no such fee for use of the License could have been concealed in the Tapias' rent payments, because the rent charged by McCool Properties was appropriate and consistent with the fair market rental rates for commercial property in that location. N.T. at 550; TCO at 20. Although Appellant's expert disagreed with Knezevich's assessment that $3,600.00 per month was a reasonable amount of rent for the Tapias to be paying to lease the space for the Famous Restaurant, N.T. at 45, the trial court, as fact-finder, found Knezevich's assessment more credible "based on his familiarity with the Property, his comparables and the scope of his analysis." TCO at 20 n.11. Appellant is asking this Court to discount the trial court's credibility determination, which we cannot and will not do. *Lomas*, 130 A.3d at 128 ("a fact-finder's credibility determinations may not be overturned by a reviewing court as long as there is sufficient evidence in the record to support those determinations"). Additionally, Stapleton's expert testimony established that there would have been no need to conceal a fee paid by the Tapias for leasing the License, because requiring remuneration for the use of a liquor license is perfectly legal. N.T. at 613; TCO at 20.

As for Appellant's allegation that the Brothers may be underreporting rent paid with cash, Appellant's Brief at 71, what her own expert stated was, "In my mind, there was a question as to whether all of that cash had been reported." N.T. at 103. Although Appellant's expert may have had "a question[,]" neither he nor any other witness presented evidence that McCool Properties' records were incomplete and, more importantly, that 340 Associates' corporate records were deficient.

Thus, we agree with the trial court that the evidence established "the Tapias were charged market rent for the Property and that there was no excess attributable to a usage fee for the License." TCO at 20.

In addition to refuting Appellant's above arguments, we further wish to note that there is no evidence that any funds or other assets of 340 Associates were used for the Brothers' personal expenses. Although the Brothers may have used their own personal funds to buoy 340 Associates, there is no evidence of the members using 340 Associates' assets to pay for personal expenses – *i.e.*, no evidence of members "us[ing] the assets of the [company] as if they were [their] own." **Mark Hershey Farms**, 171 A.3d at 816. In **Miller v. Brass Rail Tavern, Inc.**, 702 A.2d 1072, 1076 (Pa. Super. 1997), this Court also observed that the fact that certain obligations of the corporate entity, such as mortgage payments and payments to employees, were made from non-corporate sources is not enough to prove substantial intermingling of corporate and personal affairs. As the trial court observed, "[t]o the extent

such payments were made here, [Appellant] failed to establish a substantial intermingling of corporate and personal funds." TCO at 21.

*Use of the Corporate Form to Justify Wrong or to Perpetrate/Protect Fraud*[17]

The final factor is whether the Brothers used 340 Associates' corporate form to justify wrong or to perpetrate or to protect fraud. **See Commonwealth by Shapiro**, 194 A.3d at 1035; **Lomas**, 130 A.3d at 126; **see also Mark Hershey Farms**, 171 A.3d at 816 (courts must ascertain "if the corporate form is a sham").

Appellant contends that the Brothers "transferred [the License] to McCool Properties['] tenant while [Appellant]'s dram shop action was pending to avoid losing the [L]icense after the upcoming verdict" and "used their *corporate forms* to perpetrate frauds," reminding this Court that it "already determined that 340 Associates committed fraud once, as a matter of law." Appellant's Brief at 33, 45 (italics in original) (citing **Fell v. 340 Associates**, 125 A.3d 75).

Although Appellant is correct that this Court previously found that 340 Associates had committed fraud, **Fell v. 340 Associates**, 125 A.3d at 84,

---

[17] Although our case law is clear that "[t]he corporate existence can be disregarded without a specific showing of fraud[,]" **Hanrahan v. Audubon Builders, Inc.**, 614 A.2d 748, 753 (Pa. Super. 1992), it is less inexplicit as to whether the corporate veil can be pierced based only on fraud, without any other factors being established; thus, even though we have found so far that Appellant has failed to establish any other consideration used to determine if a corporate veil should be pierced, we will still address this final factor in an abundance of caution.

"[t]he fraud in the PUFTA [A]ction was the distribution of 340 Associates' only asset, the License, leaving it incapable of discharging its debt." TCO at 23. Nothing in this Court's decision explicitly held that the **corporate form** was used to perpetrate the fraud. **See Fell v. 340 Associates**, 125 A.3d at 84.

While there is no case law explicitly defining "use of the corporate form," courts have considered the phrase to mean use of the corporate form's **protections**. **See Lumax Industries**, 669 A.2d at 895 ("unjustly seeking corporate protection"); **Sams v. Redevelopment Authority of the City of New Kensington**, 244 A.2d 779, 781 (Pa. 1968) ("it must be determined that the corporate fiction is being used by the corporation itself to defeat public convenience, justify wrong either to third parties dealing with the corporation, or internally between shareholders' (derivative suits), perpetrate fraud or other similar reprehensible conduct"); **Newcrete Products v. City of Wilkes-Barre**, 37 A.3d 7, 12 (Pa. Cmwlth. 2012) ("the use of the corporate form's protection"); **Accurso v. Infra-Red Services, Inc.**, 23 F. Supp. 3d 494, 510 (E.D. Pa. 2014) ("the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners" (citations omitted)).[18]

---

[18] "Although we are not bound by decisions from the Commonwealth Court or from courts in other jurisdictions, we may use them for guidance to the degree we find them useful, persuasive, and (for other jurisdictions) not incompatible with Pennsylvania law." **Ferraro**, 185 A.3d at 404 (citing **Newell v. Montana West, Inc.**, 154 A.3d 819, 823 & n.6 (Pa. Super. 2017))**.**

> Generally, PUFTA permits a creditor to void a transfer or obligation upon direct or indirect proof of fraud. **See** 12 Pa.C.S. §§ 5101–5110. Because direct proof of fraud is rarely available, Section 5104 identifies factors—"badges of fraud"—that a court may consider in ascertaining whether the debtor executed a voidable transfer[.]

**Fell v. 340 Associates**, 125 A.3d at 81. In the PUFTA Action, the trial court, as fact-finder, held that Appellant had "established the existence of the elements of fraud at 12 Pa.C.S. § 5104(b)(4), (5), (9), and (10)." **Id.** at 79. The factors listed in those subsections are:

> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets; . . .
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred

12 Pa.C.S. § 5104(b)(4), (5), (9), (10). None of these "badges of fraud" have anything to do with use of the corporate form's protection, *i.e.*, the insulation of the company's owners -- in this case, the Brothers – from the company's liability. **See Lumax Industries**, 669 A.2d at 895; **Sams**, 244 A.2d at 781; **Newcrete Products**, 37 A.3d at 12; **Accurso**, 23 F. Supp. 3d at 510. The Brothers had never directly owned the License; *e.g.*, it is not as if the Brothers had transferred their personal asset to a corporation or limited liability company with the hope of using the protection of the corporate form to conceal the asset from their personal creditor. As the trial court aptly summarized, "it was not the misuse of the corporate form that formed the

basis of the violation of PUFTA, but rather the distribution of the asset to Kayla, which left 340 Associates unable to pay [Appellant]'s judgment" from the dram shop action. TCO at 23. Accordingly, the fact that this Court "already determined that 340 Associates committed fraud once, as a matter of law[,]" Appellant's Brief at 45 (citing *Fell v. 340 Associates*, 125 A.3d 75), is not determinative of whether the corporate form was used to justify wrong or to perpetrate or to protect fraud. *See Commonwealth by Shapiro*, 194 A.3d at 1035; *Lomas*, 130 A.3d at 126.

Appellant additionally contends that, contrary to the Brothers' claim, 340 Associates was not formed with the single purpose of holding and protecting a single asset (the License), because it also owned the bar business, as shown by the fact that 340 Associates paid food sales tax, which Appellant in turn argues is proof that 340 Associates committed fraud. Appellant's Brief at 47-49.[19] To the extent that any of these assertions are true, including that 340 Associates held more assets than just the License, these claims should be resolved as part of the execution of the judgment in the dram shop action, not as part of this separate action to pierce 340 Associates' corporate veil,

---

[19] As for Appellant's disagreement with the trial court's finding that the Brothers had hoped the License would appreciate in value over time, Appellant's Brief at 51-53 (citing TCO at 22), we fail to see how, even if proven true, this detail would establish that the Brothers used 340 Associates' corporate form to commit or to protect fraud or other wrong.

because none of these allegations demonstrate that the Brothers used 340 Associates' corporate form to commit fraud or another wrong.[20]

In general, Appellant has failed to establish that the corporate form was a sham or otherwise constituted a facade for the operations of its members. **See Mark Hershey Farms**, 171 A.3d at 816.  For example, as discussed above, Appellant has presented no evidence that the members ignored the

---

[20] Moreover, this argument seems to contradict to Appellant's narrative elsewhere in her appellate brief, where she refers to 340 Associates as "a 'shell' limited liability company [formed] to shield [the McCools], and their property holding company, from any potential liability arising from The Famous" Restaurant.  Appellant's Brief at 30; **see also id.** at 33 ("corporate 'shell' scheme"), 54 (referring to 340 Associates as "a shell corporation"), 57 (referring to 340 Associates as "an admitted 'shell' company").  **See In re Estate of Hall**, 535 A.2d 47, 50 (Pa. 1987) (equating a "shell corporation" with "a dummy corporation without assets"); **but see** 17 CFR §§ 230.12b-2 & 230.405 (both sections definitions of "shell company" include a company with "nominal assets" – not just no assets – but neither section defines "nominal").

We further observe that shell companies are not inherently malevolent, and can "have legitimate uses":

> Th[e] entity structure [of a shell company] is often used to facilitate corporate mergers, whereby two merging companies structure the transaction so that they are consolidated under a third, neutral shell company.  Similarly, this entity structure is used in joint ventures, whereby a shell company is incorporated in a neutral jurisdiction to ensure neither party to the transaction receives favoritism.  Shell companies are also used to organize partnership payments and profit-sharing agreements involving parties from different jurisdictions, potentially to allow for the pre-tax division of revenues and income between shareholders.

Idelys Martinez, "The Shell Game:  An Easy Hide-and-Go-Seek Game for Criminals Around the World," 29 St. Thomas L. Rev. 185, 210 & n.13 (2017) (citation omitted).

requisite separation of 340 Associates' corporate funds from the members' personal assets, except where the members used their own personal assets to support 340 Associates – but never using 340 Associates' assets to pay for their personal expenses – *i.e.*, "as if they were [their] own." *Id.* Additionally, Appellant also failed to present any evidence that 340 Associates was established for nefarious purposes, given that 340 Associates was created more than five years prior to Appellant's traffic collision. TCO at 2-3.

Most significantly, "340 Associates always held a valuable asset, the License, which was unencumbered by debt, and had income adequate for its limited needs." *Id.* at 22. A single-asset entity, such as 340 Associates, is not presumptively fraudulent, as the trial court thoroughly discussed:

> The use of a separate business entity to hold a liquor license is an accepted practice. The overall structure that Chris and Andy employed to hold real estate in one entity and the License in a separate entity is an accepted practice. Even a casual observer would understand that such an arrangement is to protect one set of assets, the real estate, from any liability that might result from the License. There is no law that prohibits this business arrangement. There is no law that prohibits the use of a separate business entity to hold a liquor license. *McCrery v. Scioli*, 336 Pa.Super. 455, 465, 485 A.2d 1170, 1175 (1984) ("A bonafide Pennsylvania corporation is a distinct legal entity; this includes a corporation that is a licensee under the Pennsylvania [Liquor Code].") A business structure that is permitted under the law does not defeat public convenience, justify wrong or result in fraud. Similarly, there is no law that requires a Licensee to maintain liquor liability insurance. The failure to maintain insurance when none is required under the law does not defeat public convenience, justify wrong or result in fraud. 340 Associates held an asset, the License, which was transferred to [Appellant] to partially satisfy the judgment she holds.

> Even when a corporation is owned by one person or family, the corporate form shields the individual members of the corporation from personal liability and will be disregarded only when it is abused to permit perpetration of a fraud or other illegality.
>
> ***Kellytown Co.***[ ***v. Williams***], [426 A.2d 663, 668 (Pa. Super. 1981)]. The evidence [Appellant] marshaled does not demonstrate that the corporate form was used to perpetrate a fraud or other illegality. The limited liability company business form is available to shield its members from personal liability. Because there was no prohibition on the use of the business form as employed by the Brothers, they are entitled to the advantages of the form they selected. To say otherwise would render the entire theory of the corporate entity useless. . . .
>
> The fact that 340 Associates could not pay the judgment [Appellant] received does not render the business a . . . sham. Not every business entity can pay its debts, but that does not mean there is a fraud.

***Id.*** at 21-22.

\* \* \*

Appellant has thus failed to establish any of the factors that a court may consider when deciding whether to pierce the corporate veil against the Brothers and therefore has failed to overcome the strong presumption against piercing the corporate veil in Pennsylvania. ***Lomas***, 130 A.3d at 126; ***Mark Hershey Farms***, 171 A.3d at 816. We thereby agree with the trial court that equity does not require that the members' traditional insulation of from personal liability be disregarded. ***See Mark Hershey Farms***, 171 A.3d at 816.

**McCool Properties**

The trial court entered a verdict in favor of McCool Properties. TCO at 1. Our standard of reviewing non-jury verdicts remains "whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law." *Ferraro*, 185 A.3d at 401.

As Appellant has presented no evidence that McCool Properties was ever a member of or had any ownership interest in 340 Associates, the trial court properly found that McCool Properties' assets cannot be accessed by piercing 340 Associates' corporate veil and that, ergo, McCool Properties cannot be held liable for 340 Associates' debt. TCO at 6.

Appellant's endeavor to argue otherwise is the result of her confusion over the "alter ego theory." She repeatedly refers to 340 Associates and McCool Properties as "alter ego" companies due to 340 Associates' financial dependence on the resources of McCool Properties. *See, e.g.*, Appellant's Brief at 2, 54, 63-64, 66.

However, the alter ego theory of piercing the corporate veil only applies when the actions and finances of a company and its owner or owners – be the owner(s) human or other business(es) -- are intertwined to the degree that there is no delineation between the company and the owner(s), as this Court explained in *Miners, Inc. v. Alpine Equipment Corp.*, 722 A.2d 691 (Pa. Super. 1998):

> The *alter ego* theory is applicable only where the individual or corporate owner controls the corporation to be pierced *and the controlling owner is to be held liable*. That is quite distinct from the situation where two or more corporations share common ownership and are, in reality, operating as a corporate combine. This latter theory has been labeled the *enterprise entity* theory or the *single entity* theory. . . . Under that theory, two or more corporations are treated as one because of identity of ownership, unified administrative control, similar or supplementary business functions, involuntary creditors, and insolvency of the corporation against which the claim lies.

*Id.* at 695 (emphasis in original) (citations omitted); *see also Mark Hershey Farms*, 171 A.3d at 816; *Allegheny Energy Supply*, 53 A.3d at 58 n.7; *Advanced Telephone Systems*, 846 A.2d at 1278. In other words, for the purpose of piercing the corporate veil, a corporation or limited liability company's "alter ego" can never be someone who or something that is not also a shareholder or member, respectively, no matter how much their activities and financial resources might overlap or be entwined or if they are, in reality, operating as a corporate combine. *See Miners*, 722 A.2d at 695.

Although Appellant misconstrues the alter ego theory of piercing the corporate veil, she also argues that the trial court should have pierced the corporate veil under the "enterprise entity" or "single entity" theory in order to allow access to the corporate assets of McCool Properties. Appellant's Brief at 71-74.

While Appellant may present a meaningful case that 340 Associates and McCool Properties should be treated as one entity, Pennsylvania has repeatedly refused to adopt the "enterprise entity" or "single entity" theory of

piercing the corporate veil. ***Advanced Telephone Systems***, 846 A.2d at 1278 n.9 ("'single entity' theory has yet to be adopted in Pennsylvania"); ***Miners***, 722 A.2d at 695 ("the *enterprise entity* theory or the *single entity* theory . . . , however, has yet to be adopted in Pennsylvania"). "It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court." ***In re M.P.***, 204 A.3d 976, 986 (Pa. Super. 2019) (citation omitted).[21] For this reason, we cannot consider Appellant's arguments for piercing the corporate veil pursuant to the enterprise entity or single entity theory.[22]

_____

[21] In ***In re LMcD, LLC***, 405 B.R. 555, 565 (Bankr. M.D. Pa. 2009), the United States Bankruptcy Court for the Middle District of Pennsylvania, predicted that "[t]he Pennsylvania Supreme Court would likely adopt the 'single entity theory' for the same limited purpose it chose to adopt the 'alter ego theory,'— to prevent fraud or injustice."

[22] Ergo, Appellant's arguments as to whether McCool Properties funded 340 Associates and whether McCool Properties benefited from the transfer of the License from 340 Associates to Kayla are irrelevant, because we cannot consider whether 340 Associates and McCool Properties can be treated as one entity due to their overlapping ownership and management – as Ray was deceased by the time of the fraudulent transfer, leaving only the Brothers in control of both companies -- as a basis for piercing the corporate veil. ***See*** Appellant's Brief at 50, 62-66; ***Fell v. 340 Associates***, 125 A.3d at 77-78; ***Miners***, 722 A.2d at 695; TCO at 6.

We note, however, that the record supports a finding that McCool Properties received inflated rent from Kayla (but not the Tapias) as camouflaged payment for the License – payment which otherwise would have been given to 340 Associates. According to the lease agreement between Kayla and McCool Properties, during the time period that Kayla used the License, McCool

Accordingly, McCool Properties' assets are not available for Appellant's claim against 340 Associates either under the alter ego theory or the enterprise/single entity theory. Thus, we need not consider whether there is justification to pierce 340 Associates' corporate veil to reach McCool

_____

Properties received between $4,500.00 and $6,083.26 per month in rent, with the amount escalating each year. Exhibit P-23, "Rent Rider." These payments were between $900.00 and $2,483.26 per month more than Appellant's own expert testified was a fair market rent for leasing commercial space at the Property. **Compare id. with** N.T. at 550. McCool Properties thus not only received a benefit as a result of the fraudulent transfer of the License, but this cloaked payment was one that customarily would have been disbursed directly to 340 Associates as compensation for the License, if not for the fraudulent transfer. Therefore, if the "enterprise entity" or "single entity" theory of piercing the corporate veil were available in Pennsylvania, some of McCool Properties' assets would be accessible to Appellant – specifically, the difference between the fair market rent for commercial space at the Property and the inflated rent paid to McCool Properties by Kayla as concealed payments for the License.

We empathize with Appellant's frustration over this result, but we find that no other outcome is possible given the current state of Pennsylvania law on piercing the corporate veil. **See M.P.**, 204 A.3d at 981 n.2 ("It is well-settled that the Superior Court is an error correcting court and we are obliged to apply the decisional law as determined by the Supreme Court of Pennsylvania." (citation omitted)).

As for any additional argument that the Brothers still benefited from the inflated rent payments in the form of "management fees that McCool Properties paid the individuals" and the "monthly 'expense' payments" that the Brothers withdrew from McCool Properties, Appellant's Brief at 70 (citing N.T. at 83-84, 87), the record relied upon by Appellant only shows these fees and payments distributed when the Tapias were still renting the commercial space in the Property, not when Kayla was the tenant. N.T. at 84, 86, 89 (citing Exhibit P-19E (McCool Properties' checks dated from March to May 2005) & Exhibit P-19F (McCool Properties' checks dated from January to June 2006)).

Properties' assets, because said assets would never be obtainable by this method.

\* \* \*

We therefore conclude that the findings of the trial court are supported by competent evidence and that the trial court did not abuse its discretion nor commit an error in the application of the law when it dismissed Appellant's action to pierce the corporate veil of 340 Associates. **See Ferraro**, 185 A.3d at 401; **Kovacevich**, 172 A.3d at 85; **Mark Hershey Farms**, 171 A.3d at 814–16. For the reasons set forth above, none of Appellant's claims on appeal merit relief. Consequently, we affirm the judgment.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/12/19